

FILED

Sep 25 2017, 10:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mark S. Fryman, Jr.
Scott L. Starr
Starr Austen & Miller, LLP
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Mark R. Wenzel
Debra A. Mastrian
Martha R. Lehman
SmithAmundsen LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kellam Excavating, Inc., <br> *Appellant-Intervening Defendant,* <br><br> v. <br><br> Community State Bank, <br> *Appellee-Intervening Plaintiff* | September 25, 2017 <br><br> Court of Appeals Case No. <br> 09A02-1704-PL-760 <br><br> Appeal from the Cass Circuit Court <br><br> The Honorable Leo T. Burns, Judge <br><br> Trial Court Cause No. <br> 09C01-1504-PL-24 |

**Baker, Judge.**

[1] Community State Bank (the Bank) provided financing to Sagamore Warehouse, LLC (Sagamore), for the construction of a fertilizer plant by Kellam Excavating, Inc. (Kellam), on property Sagamore leased from Winamac Southern Railway Company (Winamac). Kellam did not receive full payment for its work and filed a mechanic's lien. After Sagamore and Kellam filed complaints against each other, the Bank intervened and filed a third-party complaint to foreclose on its leasehold mortgage on Sagamore's property. The Bank also filed a motion for summary judgment, arguing that its interest in the property should receive priority. The trial court entered summary judgment for the Bank, finding that its mortgage takes priority over Kellam's mechanic's lien. Kellam now appeals, arguing that the trial court erred in prioritizing the Bank's interest. Finding no error, we affirm.

# Facts

[2] Sagamore operated a fertilizer wholesaler business that sold fertilizer to farmers in the Midwest. It required a fertilizer storage, processing, and handling facility (the Facility Improvements). On July 25, 2013, Sagamore and Winamac entered into a land lease, pursuant to which Winamac leased Sagamore real property (the Real Estate) located in Logansport. Sagamore's right, title, and interest in and to the Real Estate under the land lease is, collectively, the "Leasehold Estate."

[3] On July 30, 2013, Sagamore and Kellam entered into a construction contract under which Kellam would build the Facility Improvements on the Real Estate.

Kellam began construction on the Facility Improvements on October 25, 2013. Meanwhile, Sagamore needed additional capital and sought financing for construction of the Facility Improvements from the Bank.

[4] The Bank and Sagamore executed four instruments for its financing deal. On December 31, 2013, the Bank and Sagamore entered into Master Lease 2013-25, and on May 16, 2014, the Bank and Sagamore entered into Master Lease 2014-02, Master Lease 2014-03, and Master Lease 2014-04 (collectively, the Master Leases). Under the Master Leases, the Bank financed the provision of certain equipment to Sagamore, Sagamore agreed to make quarterly payments to the Bank, and Sagamore acknowledged the Bank's interest in the leased equipment. The Bank filed financing statements for its interests described in each Master Lease. After the May 2014 closing, the Bank paid Kellam $1,620,156 for costs related to the construction of the Facility Improvements. Kellam subsequently refunded $1,620,156 to Sagamore for funds Sagamore had previously paid Kellam before the Bank financed the project. On June 23, 2015, each of the Master Leases was modified under a Master Lease Modification Agreement. The Master Leases, the modifications, and the financing statements are, collectively, the "Equipment Leases."

[5] On May 16, 2014, Sagamore granted the Bank a Leasehold Mortgage, Security Agreement, Assignment of Leases, and Rents and Fixture Filing (collectively, the Leasehold Mortgage) to serve as collateral. The Bank perfected its lien on June 24, 2014, by recording the Leasehold Mortgage with the Cass County Recorder. Pursuant to the Leasehold Mortgage, Sagamore mortgaged to the

Bank all of Sagamore's right, title, and interest in the Leasehold Estate; in all fixtures, appliances, and articles of personal property connected with the operation of the Real Estate; and in all buildings, structures, and improvements connected with the Real Estate.

[6] On March 6, 2015, Kellam recorded a mechanic's lien for work performed on the Facility Improvements. On April 27, 2015, Sagamore filed a complaint against Kellam alleging breach of contract, among other claims. On August 6, 2015, Kellam filed a counterclaim against Sagamore, alleging that it had not been paid for work completed and seeking foreclosure on its mechanic's lien. On April 18, 2016, the Bank intervened to file a third-party complaint alleging that Sagamore was in default under the Equipment Leases and the Leasehold Mortgage and seeking foreclosure on its Leasehold Mortgage.

[7] On May 31, 2016, the Bank filed a motion for summary judgment, arguing that the trial court should enter judgment in favor of the Bank with regard to the Equipment Leases and the Leasehold Mortgage, and enter an order finding that the lien created by the Leasehold Mortgage is superior to any other interest and foreclosing on it in favor of the Bank. On September 6, 2016, Kellam filed a response in opposition to the Bank's motion for summary judgment and a motion for partial summary judgment, arguing that because the Bank is an owner and not a lender, Kellam's mechanic's lien is superior to the Bank's interest.

[8]     A hearing took place on December 16, 2016, regarding the parties' motions. On March 14, 2017, the trial court granted the Bank's motion for summary judgment and denied Kellam's motion for partial summary judgment, finding that the Bank's Master Leases constitute financing arrangements that take priority over Kellam's mechanic's lien. Kellam now appeals.

## Discussion and Decision

[9]     Kellam appeals the trial court's entry of summary judgment in favor of the Bank, arguing that the trial court erred in prioritizing the parties' liens.

[10]    Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[11]    Three statutes govern priority between a mortgage and a mechanic's lien: Indiana Code sections 32-21-4-1(b), 32-28-3-2, and 32-28-3-5(d). Our goal in statutory interpretation is to determine, give effect to, and implement the intent

of the legislature as expressed in the plain language of its statutes. *Clark Cty. Drainage Bd. v. Isgrigg*, 966 N.E.2d 678, 680 (Ind. Ct. App. 2012).

[12]     Our Court has previously discussed the interplay between the three relevant statutes and the question of mortgage lien priority versus a later-recorded mechanic's lien as to improvements provided on commercial property as follows:

> The first statute relevant to this dispute is Indiana Code section 32-21-4-1(b), which provides, in pertinent part, that "[a] conveyance, mortgage, or lease takes priority according to the time of its filing." Relying on this statute, we have said that a mortgage lien is superior to a mechanic's lien "if the mortgage was recorded before the mechanic's work was begun or materials furnished." *Provident Bank v. Tri-County Southside Asphalt, Inc.,* 804 N.E.2d 161, 163 (Ind. Ct. App. 2004), *aff'd on reh'g,* 806 N.E.2d 802 (Ind. Ct. App. 2004), *trans. denied.*

> However, we also have Indiana Code section 32-28-3-2, which provides:

>> (a) The entire land upon which the building, erection, or other improvement is situated, including the part of the land not occupied by the building, erection, or improvement, is subject to a lien to the extent of the right, title, and interest of the owner for whose immediate use or benefit the labor was done or material furnished.

>> (b) If:

>>> (1) the owner has only a leasehold interest; or

(2) the land is encumbered by mortgage;

> the lien, so far as concerns the buildings erected by the lienholder, is not impaired by forfeiture of the lease for rent or foreclosure of mortgage. The buildings may be sold to satisfy the lien and may be removed not later than ninety (90) days after the sale by the purchaser.

We have said that "[t]he plain language of this statute protects the mechanic lien holder inasmuch as it protects his priority as to the improvement for which he provided the labor and materials." *Provident Bank,* 804 N.E.2d at 164. "The statute contemplates that the holder of a mechanic lien may sell the improvements to satisfy the lien and remove them within ninety days of the sale date." *Id.* This statute, as written and as applied by this court, seems to favor the mechanic's lienholder with regard to new improvements even if the mortgage is recorded before the mechanic's lien is recorded and before the mechanic's lienholder begins its work or furnishes any materials.

Finally, we have Indiana Code section 32-28-3-5(d), which provides that, as to commercial property (including commercial residential property, *e.g.,* apartment complexes), "[t]he mortgage of a lender has priority over all liens created under this chapter that are recorded after the date the mortgage was recorded, to the extent of the funds actually owed to the lender for the specific project to which the lien rights relate." The first clause of subsection (d)—"The mortgage of a lender has priority over all liens created under this chapter that are recorded after the date the mortgage was recorded"—appears to give priority to the mortgage of a lender as long as it is recorded first, in contrast to Indiana Code section 32-28-3-2, which, as noted above, seems to favor the mechanic's lienholder with regard to new improvements even if the mortgage is recorded before the effective date of the mechanic's lien. . . .

[U]nder subsection (d), the mortgage of a lender has priority *only* "to the extent of the funds actually owed to the lender for the specific project to which the lien rights relate." I.C. § 32-28-3-5(d). . . .

With regard to priority over improvements, Indiana Code section 32-28-3-2 provides the general rule. As stated in *Provident Bank*, 804 N.E.2d at 164, the plain language of that statute "protects the mechanic lien holder inasmuch as it protects his priority as to the improvement for which he provided the labor and materials." On the other hand, Indiana Code section 32-28-3-5(d) provides the more specific rule with regard to priority over improvements on commercial property where the funds from the loan secured by the mortgage are intended to finance those improvements and where the mortgage is recorded before the mechanic's liens. . . . [W]e explicitly hold today what has previously been stated only in dicta in a dissenting opinion: *With regard to commercial property, where the funds from the loan secured by the mortgage are for the specific project that gave rise to the mechanic's lien, the mortgage lien has priority over the mechanic's lien recorded after the mortgage.*

*Harold McComb & Son, Inc. v. JP Morgan Chase Bank, NA*, 892 N.E.2d 1255, 1259-62 (Ind. Ct. App. 2008) (emphasis added). This holding is commonly referred to as the Lender Exception.

[13] Kellam makes several arguments on appeal as to why the trial court erred. Of significance is Kellam's argument that the Lender Exception does not apply to this case because the Bank does not have a mortgage, the Bank is not a lender, and the Bank's interest does not relate to the Facility Improvements. At the same time, Kellam acknowledges that the Bank "could have loaned the funds to build the [Facility Improvements], took [sic] a mortgage and the Lender

Exception would have prioritized [the Bank's] mortgage over Kellam's mechanic's lien." Appellant's Br. p. 15. We find this "hypothetical" situation to be exactly what happened in this case.

[14] Kellam argues that the Leasehold Mortgage is not a mortgage because the mortgage is described as a *leasehold* mortgage, Sagamore did not promise to repay the Bank for the funds the Bank expended, and Sagamore did not execute a promissory note. A mortgage is defined as a "conveyance of title to property that is given as security for the payment of a debt or the performance of a duty and that will become void upon payment or performance according to the stipulated terms" and as a "lien against property that is granted to secure an obligation (such as a debt) and that is extinguished upon payment or performance according to stipulated terms." *Mortgage, Black's Law Dictionary* (10th ed. 2014).

[15] The Bank's Leasehold Mortgage fits squarely into this definition. Kellam's emphasis on the word "leasehold" in the instrument's title places semantics over substance. Regardless of what the Bank's financing document is called, it operates like a typical mortgage. The instrument granted the Bank a lien against Sagamore's property rights; the lien secured Sagamore's obligation to repay the Bank for the funds the Bank expended. The Master Leases show that Sagamore was obligated to make quarterly payments to the Bank until the funds were fully repaid. Appellant's App. Vol. IV p. 26, 45, 73, 97. As for Kellam's contention that the Leasehold Mortgage is not a mortgage because Sagamore did not execute a promissory note, Kellam fails to cite any authority that states

that a promissory note is required to execute a valid mortgage, nor do we find any. Accordingly, we find that the Bank's Leasehold Mortgage is a mortgage for the purposes of the Lender Exception.

[16] Kellam next argues that the Bank is not a lender but instead a purchaser and owner. A "lender" includes a supervised financial organization or any other entity that has the authority to make loans. I.C. § 32-28-3-5(a). A supervised financial organization includes a business that is "organized, chartered, or holding an authorization certificate under the laws of a state . . . that authorizes the [business] to make loans and to receive deposits . . . ." Ind. Code § 26-1-4-102.5(a). Because the Bank is an Indiana-chartered banking institution, *see* Appellant's App. Vol. II p. 93, it is a supervised financial organization under the statute. In short, the Bank is a "lender" under the Lender Exception.

[17] Lastly, Kellam contends that the Lender Exception does not apply because the Bank's lien does not relate to the specific project—the construction of the Facility Improvements—but rather to the Leasehold Estate. We disagree. Simply put, Sagamore sought additional financing from the Bank for the construction of the Facility Improvements, and the Bank's funds were used for such construction. Appellant's App. Vol IV p. 149; Appellant's App. Vol. VI p. 84. Thus, the Bank's lien relates to the specific project for which Kellam contracted with Sagamore.

[18] The parties do not dispute that the Real Estate and Facility Improvements are commercial property or that the Bank recorded its Leasehold Mortgage before

Kellam recorded its mechanic's lien. The funds that the Bank loaned were secured by the mortgage for the specific project—the Facility Improvements—that gave rise to Kellam's mechanic's lien. In short, the Bank's mortgage secured its loan of funds used to construct the Facility Improvements. The Lender Exception applies, and as a result, the Bank's mortgages are superior to Kellam's mechanic's lien. Because we find that the Lender Exception applies, we need not consider Kellam's remaining arguments. The trial court did not err in prioritizing the liens.

[19] The judgment of the trial court is affirmed.

Najam, J., and Pyle, J., concur.